# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ROSEMARY MADLOCK,

                Plaintiff,

v.

WEC ENERGY GROUP INC.,

                Defendant.

Case No. 16-CV-332-JPS

**ORDER**

## 1. INTRODUCTION

The plaintiff, Rosemary Madlock ("Madlock"), filed this action against the defendant, WEC Energy Group Inc. ("WEC"), on allegations of racial discrimination in employment and retaliation. *See generally* (Docket #1). On November 1, 2016, WEC filed a motion for summary judgment. (Docket #21). Madlock submitted her response on December 1, 2016. (Docket #39). WEC offered a reply in support of the motion on December 15, 2016. (Docket #43). The motion is fully briefed and, for the reasons explained below, it will be granted.

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides the mechanism for seeking summary judgment. Rule 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes

all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

## 3. RELEVANT FACTS

### 3.1 Improper Briefing

Preliminarily, the Court notes that the disposition of this motion is based largely on the parties' refusal to comply with the rules of summary judgment practice. The parties' factual briefing is replete with unsupported facts, multiple assertions of fact within one paragraph, and legal argument. They also have included numerous facts which are plainly irrelevant to the issues presented.

The parties have also made curious additions and omissions in their fact briefs. Madlock fails to reproduce all of WEC's asserted facts and state her disputes with them or lack thereof. As to the facts she actually mentions, Madlock includes legal argument in the form of improper objections. For instance, she often objects as to relevance, when that issue may be argued in her legal brief, and objects to completeness or that "issues of fact exist" rather than simply stating her dispute and citing the appropriate evidence. WEC is not blameless either. Like Madlock, it submits a great deal of commentary and legal argument on the facts rather than directly stating a given dispute. It also regularly fails to cite any evidence to oppose facts. Finally, it offers a "reply" in support of its statement of facts, though no such document is contemplated by this District's Local Rules; the "reply" will be entirely disregarded. *See* Civil L. R. 56(b)(3).

The Court expects that the parties will carefully review the requirements of the federal and local rules on summary judgment, and that these woeful submissions will not be repeated in the future. Despite the substantial infirmities with the parties' factual briefing, the Court has done its best to formulate a set of undisputed facts. If the parties are surprised by the inclusion or exclusion of certain facts, they have only themselves to blame.

### 3.2 Undisputed Facts

The facts presented below are limited to a general timeline of events and those relevant to the Court's analysis. Madlock is African-American. She has worked for WEC for almost forty years. Madlock has worked in the Meter to Bill department for approximately the past twenty years. Meter to Bill is further subdivided into the Industrial Billing group, handling large commercial accounts, and Volume Billing, addressing small commercial accounts and residential customers. Madlock began her Meter to Bill tenure in the Industrial Billing group.

Madlock's co-workers, and Madlock herself, describe her as a confident and knowledgeable worker to whom other employees often go for assistance. Though WEC had no formal training procedure for Industrial Billing, Madlock and other experienced billers provided informal training. In 2011, Cathy Wrycza ("Wrycza") became Madlock's supervisor. Prior to that time, the parties dispute the quality of Madlock's job performance and whether there were hints or outright statements showing discriminatory animus by her superiors.[1]

---

[1]The Court gives short shrift to this time period because it is not only beyond the scope of the Complaint, it is beyond the statute of limitations. *See* (Docket #1); *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 269 (7th Cir. 2004).

Other employees on Wrycza's team observed that she was not very good at billing, and when Madlock tried to help her, Wrycza would become upset. This, in Madlock's view, led to retaliatory discipline. WEC maintains that Madlock's discipline was appropriate given its recent emphasis on improving customer service through, *inter alia*, accurate billing. This was not only Wrycza's duty to implement, but fell to her superiors as well. Wrycza and Renee Rabiego-Tiller ("Tiller"), the manager of the Meter to Bill area and Wrycza's boss, never specifically looked for errors in Madlock's work; those were always presented to them by a third party. Wrycza believes that Madlock's errors were due to carelessness, not a lack of experience or training.

In February 2012, Madlock was issued a "Record of Corrective Counseling" ("RCC"), a form of internal discipline, for two work errors, one of which had occurred in December 2011. Both errors concerned an inaccurate meter reading, and the parties dispute to what extent Madlock was responsible for failing to investigate the error. WEC claims the errors cost it over $80,000.[2] Madlock filed a grievance in response to the discipline. The grievance was denied by Wrycza and Tiller. In doing so, Wrycza acknowledged that as to the December error, the account in question had been consistently billed incorrectly in the months preceding Madlock's

---

[2]Madlock states that WEC never actually lost money on any of her errors, while WEC counters that she has laid no foundation for the assertion; Madlock has never worked in the company's accounting department. (Docket #44 at ¶ 77). Madlock merely states what she *believes* WEC's accounting practices to be, while Tiller's testimony on the financial impact is based on her supervisory position and exhibits from WEC's computer system. (Docket #42-1 at 8, 12; Docket #23). The Court cannot credit Madlock's unsupported belief in the face of WEC's direct evidence, and so must find that WEC's statements about the financial consequences of Madlock's errors are undisputed (this issue is repeated throughout the parties factual briefing).

involvement. When the grievance came to Tiller, she denied it on the basis of a newly discovered error on a different account.

In May 2012, Wrycza issued a written warning to Madlock for taking only twenty seconds to review an account, which led to the customer being overbilled by almost $60,000. The warning stated that additional errors could lead to greater discipline or even termination. Such warnings are a step higher than an RCC on the disciplinary ladder.[3]

In August 2012, Jean Frelka ("Frelka"), the director of Meter to Bill, reduced the February 2012 RCC to a "coaching," a lesser form of discipline. The May 2012 warning was also lowered to the level of an RCC. Frelka nevertheless stressed that Madlock was to apply her experience and knowledge with a critical eye to find potential problems and raise those issues with management. The RCCs kept coming for Madlock, however. In October 2012, Madlock was issued another RCC for a billing error, and in light of her previous errors, Tiller concluded that it was the result of Madlock's inattention to detail. Yet another RCC was issued in November 2012, this time for inappropriate and unprofessional behavior. Madlock's grievance on this latest RCC was denied by Wrycza, on Frelka's orders, because the inappropriate behavior was reported by multiple sources.

Wrycza was made aware of another error in early 2013 which had originated in December 2010. This error involved mis-coding an account such that it would not be billed even though the customer was using energy. Madlock maintains that the error was the result of the meter itself being broken, which WEC ultimately confirmed was true. She further admits, however, that her job was not restricted to merely passively receiving

---

[3] This progressive disciplinary system is maintained in part because of a workers' union operating at WEC, of which Madlock was a member.

information from broken meters, improper readings, or otherwise, but that she needed to use her experience and judgment to critically assess the information provided. In general, when assigned to review an account's bill, billers must use their skills and experience to determine whether the bill is accurate and/or what caused an inaccuracy. Madlock contends that this can be difficult, however, because the billers have no way of confirming whether the data presented to them is correct. Wrycza believed that Madlock should have discovered the December 2010 issue, but did not impose any discipline. She did discipline another biller, Paul Zaren ("Zaren"), a white male, for an error he made on the account.

WEC does not dispute that it has no formal standards for determining whether, and what kind, of discipline is warranted for a given issue. It also does not dispute that Madlock was the only person issued written discipline by Wrycza while Wrycza worked in Madlock's area. For instance, another employee made a billing error in December 2011, and although Wrycza and Tiller knew about it, they did not issue written discipline. Madlock and a few of her fellow billers believe that management was aware of many mistakes but cherry-picked those they wished to discipline. Madlock eventually began copying Tiller and Frelka on her e-mails to Wrycza, given their strained relationship, but was told to stop doing that. Madlock also met separately with her co-workers, which upset Wrycza, and eventually led to a meeting between the two and Tiller in February 2013, wherein Tiller asked them to communicate better.

In March 2013, Tiller told Madlock that she was being transferred from Industrial Billing to Volume Billing because of the impact of her

repeated billing errors.⁴ Shemeika Phillips ("Phillips"), supervisor of the Volume Billing team to which Madlock had been transferred, was told by Wrycza that Wrycza was insecure about dealing with Madlock, a "strong black woman."⁵ Cynthia Armstead ("Armstead"), another of Madlock's coworkers, asked Wrycza about the transfer, who stated that Madlock had wanted to leave Industrial Billing to explore other opportunities. WEC maintains that the transfer decision was Tiller's alone and that Wrycza was not even asked her opinion on the issue.⁶ Madlock believes that Tiller's decision was meant to placate Wrycza and was also based on racial animus, though she never heard Tiller make any racist comments and none were ever relayed to her by anyone else.

As part of the move, Madlock was placed in the middle of the Volume Billing room between two supervisors. Despite being in a supervisory position, Madlock was also not initially given a team to lead (though she apparently has a team now). Phillips also spoke with Madlock, relaying that Tiller wanted to know if Madlock had been humiliated by the transfer.

Phillips suggested that Madlock file a complaint, which she did in

---

⁴Madlock believes this was akin to a demotion, not because of a pay or title change, but because the duties were lesser than what she previously had. (Docket #44 at ¶ 60). This, and many other proposed facts on this issue, are based solely on hearsay and are therefore not properly supported.

⁵This comment has also been quoted as a "strong willed African-American woman." Madlock would characterize herself as strong-willed and concedes that being strong-willed is not a negative attribute.

⁶Madlock attempts to dispute this assertion by citing to a span of fifty-five of her own statements of fact. This falls far short of making "*specific* references to the affidavits, declarations, parts of the record, and other supporting materials relied upon" to dispute facts. *See* Civil L. R. 56(b)(2)(B)(I) (emphasis added). The Court will not hunt through the cited facts to find support for the dispute, and so the dispute must be rejected.

April 2013. Madlock's complaint to WEC's human resources department stated that she had been discriminated against on the basis of age and race, and she listed a number of coworkers as witnesses. Ebony Brumfield ("Brumfield"), a human resources employee, investigated the discrimination complaint and interviewed a number of witnesses. Brumfield concluded that no discrimination could be substantiated. No one ever told Madlock that any management personnel were upset with her for filing the discrimination complaint.

In May 2013, Brumfield informed Wrycza of Madlock's complaint. Wrycza relayed that information to Tiller. Previously, in April 2013, Tiller and Phillips had been made aware of another billing error Madlock had made in August 2012. This error also involved field equipment problems and again, the parties dispute whether this error was entirely Madlock's fault, though it is undisputed that she spent only three minutes reviewing the account. The error caused the customer to be overbilled by $10,000.

Later in May, Phillips issued Madlock a written warning for that error. The parties dispute whether Tiller ordered Phillips to do so or if it was a mutual agreement. Shelly Ward ("Ward"), one of Madlock's previous supervisors, opined that the punishment did not make sense because it came too long after the alleged error. Tiller confirmed that she knew of no one else being disciplined for errors occurring nine months prior. Cynthia Mauch ("Mauch"), a call center employee and union representative, also stated that she had never seen a situation where WEC would discover an error months after it occurred.

Madlock objected to the warning because she felt it was based on equipment malfunction or other field errors, an issue for which she should not have been subject to discipline, rather than something within her control.

Page 8 of 17

Case 2:16-cv-00332-JPS   Filed 01/13/17   Page 8 of 17   Document 46

At the end of May 2013, Madlock filed a grievance on this latest warning, questioning the time span between the alleged error and the imposition of discipline. Wrycza and Phillips then compiled a history of Madlock's disciplinary actions, though some of the entries were not formal discipline that Madlock had been made aware of. Wrycza presented the list to Tiller, who asked for a similar update on discipline history for all of her subordinates.

In June 2013, Phillips and Wrycza met with Mauch and Madlock, then denied the grievance. Madlock contends that the discipline list, apparently a factor in the denial, was not entirely accurate. Her grievance was then denied at each subsequent level of review, including by Tiller in July, Frelka in September, and Joan Shafer ("Shafer"), Vice President of Customer Services, in November. Shafer said she was shocked at Madlock's history of errors and coachings. Despite being upheld, the written warning did not result in Madlock's suspension.

In December 2013, a claims analyst position was opened. A claims analyst investigates and mediates customer disputes, requiring patience, courtesy, and diplomatic and tactful communication skills. The position would be a promotion and pay increase for Madlock, and she applied. Phillips completed a recommendation form rating Madlock's work as generally adequate, while also noting coaching on unprofessional communications and the recent written warning. At WEC, such warnings can prevent an employee from obtaining a promotion or pay increase.

Connie Muñoz ("Muñoz") was the hiring manager for the claims analyst position. She decided not to hire Madlock based on the recent warning, disciplinary history, and previous issues with interpersonal relations. Muñoz instead selected Catherine Rouse, also African-American,

for the position. Neither Wrycza nor Tiller had any role in Muñoz's decision, and Muñoz had no knowledge of Madlock's discrimination complaint until after the hiring decision was made.[7]

Madlock was informed that she did not get the job in January 2014. She filed a grievance on the issue, which was denied by Muñoz later that month. Muñoz indicated that Madlock lost out on the claims analyst job in part based on a review of Madlock's personnel file, which showed a pattern of increasingly serious discipline. Madlock maintains that Muñoz was presented an inaccurate history of discipline, including phantom coachings. Madlock also contends that the connection between the recent written warning and the denial of promotion was apparent, though she admits she has no personal knowledge of Muñoz's reasons for the decision. In March 2014, John Tice ("Tice"), apparently Muñoz's superior, also denied the grievance based on disciplinary concerns.

Madlock cites a number of similarly-situated employees as having committed billing errors while receiving little or no discipline. However, Madlock has few specifics for any of the alleged errors. She testified that those employees never told her that management was aware of their errors, and Madlock's supervisors were unaware of any of her coworkers making repeated errors. Madlock concedes that her coworkers' errors did not cost WEC any money. By contrast, WEC maintains that Madlock's errors cost it more than $100,000, far more than any other employee.

---

[7]Madlock again cites a large span of her statements of fact as support, without explanation as to how they raise a genuine dispute. The Court rejects Madlock's attempt to foist her obligation to find specific factual support for her disputes onto the Court.

One potential comparator, Zaren, was given a written warning by Wrycza in February 2014 for unprofessional behavior. He filed a grievance about the warning but the warning was not rescinded or reduced. He was nevertheless promoted in July 2014. Wrycza completed a recommendation form for Zaren, like the one Phillips wrote for Madlock, in the context of his promotion. Zaren was hired by the human resources department; Frelka, Tiller, and Wrycza were not involved in making the hiring decision. The hiring manager, Mark Williamson, concluded that Zaren's warning was an isolated incident on his record and that he was otherwise the best-qualified candidate for the position.

**4.     ANALYSIS**

Madlock brings two claims pursuant to 42 U.S.C. § 1981. First, she alleges that the discipline she received and her transfer to Volume Billing was the result of racial discrimination on Wrycza's part. (Docket #39 at 1). Second, Madlock contends that Wrycza and Tiller retaliated against her after she filed her internal discrimination complaint. *Id.* Even when viewing the facts in a light most favorable to her, neither of Madlock's claims has merit.

**4.1     Discrimination**

The Seventh Circuit recently announced that the proper standard for assessing discrimination claims "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). This holding disposes of the distinction between direct and indirect evidence. *Id.* It does not, however, affect the elements of a discrimination claim or the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Harris v. Off. of the Chief*

Page 11 of 17

Case 2:16-cv-00332-JPS   Filed 01/13/17   Page 11 of 17   Document 46

*Judge of the Circuit Ct. of Cook Cnty.*, No. 16-1783, 2016 WL 7228703 *2 (7th Cir. Dec. 13, 2016).

Under the *McDonnell Douglas* framework, Madlock bears the burden to produce evidence sufficient to support a favorable jury finding that: "(1) [s]he is a member of a protected class, (2) [s]he was meeting [WEC's] legitimate expectations, (3) [s]he suffered an adverse employment action, and (4) similarly situated employees who were not members of [her] protected class were treated more favorably." *Harris*, 2016 WL 7228703 at *2. If she establishes those elements, WEC must then articulate legitimate and nondiscriminatory reasons for the allegedly discriminatory action. *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014), *overruled on other grounds*, *Ortiz*, 834 F.3d at 764-65. Finally, the burden shifts back to Madlock to show that the reasons WEC offered were mere pretext for its discriminatory motives. *Id.*

On the discrimination issue, Madlock's brief is compilation of facts and argument with little structural relation to the *McDonnell Douglas* framework, making it difficult to discern her specific position with respect to each element. *See* (Docket #39 at 2-13). Nevertheless, even gleaning what it can from her brief, the Court finds that Madlock fails to establish the fourth element of her initial burden. This is true even assuming, without deciding, that she was meeting WEC's expectations, and that the disciplinary actions and transfer to Volume billing were adverse employment actions. Madlock cannot point to any similarly-situated non-African-American employees who were treated better than her.

First, Madlock has not provided examples of any similarly-situated employees to which she might be compared. To prevail on this issue, "a plaintiff must identify a comparator who is 'directly comparable to her in all material respects . . . to eliminate other possible explanatory variables.'"

*Williams v. Off. of Chief Judge of Cook Cnty., Ill.*, 839 F.3d 617, 626 (7th Cir. 2016) (quoting *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013)). The comparator "need not be identical in every conceivable way," but of particular note here, "[a]n employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated." *Harris*, 2016 WL 7228703 at *3 (quotations omitted). A proper comparison "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). Madlock concedes that her supervisors were unaware of any other employee making repeated mistakes like she did, and that no other employee's mistakes were as costly as hers. More importantly, her general averment that all billers made mistakes, without providing specific examples commensurate with her own extensive error- and discipline-ridden history, does not create a genuine dispute of fact.

Second, WEC points to one potential comparator, Zaren, as an example showing that Madlock was treated more favorably than a non-African-American employee. While under Wrycza's supervision, Zaren committed billing errors and had an issue with unprofessional behavior, and was disciplined in each instance. Unlike Madlock, the discipline visited on him was not reduced or rescinded. Though Zaren was later promoted to a human resources position, none of Madlock's supervisors were involved in that decision. Madlock's discrimination claim fails, then, for want of any similarly-situated, non-African-American employees who were treated more

favorably than her. *Williams*, 839 F.3d at 627 (failure to identify similarly-situated employee "is fatal to her discrimination theory").

### 4.2 Retaliation

To succeed on a retaliation claim "based on events occurring in the workplace, an employee must show that she suffered a materially adverse action because she engaged in protected activity." *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016). Madlock asserts two instances of adverse action: 1) the written warning she received in May 2013, and 2) her non-selection for the claims analyst position. Taking the second action first, Madlock cannot show causality, since Muñoz was unaware of Madlock's discrimination complaint until after the claims analyst position was filled. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("The key inquiry in determining whether there is a causal connection . . . is whether Patterson was aware of the allegations of discrimination at the time of her decisions[.] . . . [A]bsent such knowledge, there can be no causal link between the two. . . . It is not sufficient that Patterson could or even should have known about Luckie's complaints; she must have had actual knowledge of the complaints for her decisions to be retaliatory.") (citation omitted). Thus, WEC's failure to promote Madlock cannot form a basis for retaliation.

As to the first action, Madlock never suffered any materially adverse consequences. The emphasis here is materiality, as "[f]ederal law protects an employee only from retaliation that produces an injury, and, therefore, an employer's retaliatory conduct is actionable only if it would be materially adverse to a reasonable employee." *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009). The injury that results from the alleged retaliation must be severe enough that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss*, 816 F.3d at 918. Madlock

Page 14 of 17

Case 2:16-cv-00332-JPS   Filed 01/13/17   Page 14 of 17   Document 46

must show that she "suffer[ed] something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* at 918-19 (quoting *Hobbs v. City of Chicago*, 573 F.3d 454, 463-64 (7th Cir. 2009).

Madlock does not contend that she was fired, demoted, or had her pay reduced as a result of the May 2013 written warning. Her only claim that the action was adverse is that it *could* lead to possible termination. The theoretical possibility that a current action may lead to materially adverse action in the future does not make the current action itself materially adverse. *See Poullard v. McDonald*, 829 F.3d 844, 855-57 (7th Cir. 2016) (unfulfilled threats of future discipline, without more, are not materially adverse); *Brown v. Advocate S. Surburban Hosp.*, 700 F.3d 1101, 1106-09 (7th Cir. 2012) (rejecting retaliation claim where the plaintiffs were not fired or denied pay, and where a negative personnel review did not result in actual consequences); *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1120-21 (7th Cir. 2009) (similar to *Poullard* and collecting cases). It is important to note the temporal constraints on this issue. Though Madlock asserts various other potentially adverse actions, including being placed in a workspace between two managers and being provided no group to lead, those actions took place in March 2013, well before she made her discrimination complaint.

Finally, the Court notes that Madlock has raised an issue of "false peppering" of her personnel file with Tiller and Phillips' compilation of her disciplinary history, which she claims was inaccurate. First, her allegations of inaccuracy fail to create a genuine dispute as to whether creation or dissemination of the list was a materially adverse action. While Madlock contends that there were some inaccurate entries on the list, she did not testify that all or even the majority of the entries were imaginary. In fact, her testimony on the point primarily relates to whether or not a particular

instance qualified as a "coaching," not whether the discipline incident occurred at all. The Court cannot agree that the simple act of creating and distributing the list, even when it may have included some inaccuracies, would discourage a reasonable employee from asserting a charge of discrimination. *See Cole v. Illinois*, 562 F.3d 812, 816-17 (7th Cir. 2009) (imposition of employee improvement plan and receiving other work criticisms was not a materially adverse action). Second, the "false peppering" issue appears to relate in large measure to Madlock's failure to obtain the claims analyst position, which the Court has already rejected as temporally improper.[8]

### 5. CONCLUSION

Madlock has failed to marshal evidence sufficient to create triable issues of fact on her claims. Thus, the Court must grant WEC's motion for summary judgment and dismiss this action. WEC's motion to seal various summary judgment filings—to avoid disclosure of confidential customer information—will also be granted. (Docket #20).

Accordingly,

**IT IS ORDERED** that the defendant's motion for summary judgment (Docket #21) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the defendant's motion to seal (Docket #20) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

---

[8]The parties' briefs imply that the "false peppering" issue is not merely based on the compiled list, but is in fact a challenge to Madlock's actual history of discipline. If true, the argument must also be rejected as lacking causality; it was impossible for Wrycza to "pre-pepper" Madlock's personnel file with instances of discipline in retaliation for a non-existent discrimination complaint.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 13th day of January, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge